GEORGE K. HALE MFG. CO. v. HAFLEIGH
& CO. et al.

No. 4487.

Circuit Court of Appeals, Third Circuit.

Sept. 9, 1931.

The opinion of Kirkpatrick, District Judge, is as follows:

### Sur Pleadings and Proofs.

This is a bill in equity based on the alleged infringement of United States patent No. 1,594,490 to Bertolet for a method of dyeing bone articles and the product thereof. Both the plaintiff and the defendant are manufacturers of dyed bone buttons.

The specification describes first the composition of a dye bath as follows:

"This process consists in treating bone material and any bone article with suitable coloring matter, such as oil soluble, fat soluble, spirit soluble, insoluble azo, and basic dyes or color bases or mixtures of the same in solutions of fats, oils or fatty acids, such for example (though not necessarily) lard oil, tallow, stearic or oleic acid.

"The preferred method for most colors is to mix thoroughly the coloring matter with anywhere from 25% to 45% melted fat, oil, or fatty acid solution, and while still warm to mix about 4% coal tar distillate, and then thoroughly mix and add from about 50% to 75% of some penetrant such as organic solvent or crude petroleum oil distillates, such as naphtha of the various specific gravities, kerosene, paraffin oil, and wax, or related materials, mixtures of derivatives of the same; or coal tar distillates such as benzine, toluene, phenol, cresol or related bodies, mixtures, or derivatives of the same; or organic solvents such as ethyl, methyl, the higher alcohols; glycerol, or carbon tetrachloride."

In the next paragraph the suggestion is made that, dependent upon the varying characteristics of the dyes, it is possible to omit one or more of the above-named ingredients.

A dye bath having been obtained by mixing the ingredients referred to, the so-called process or method of dyeing consists of simply placing the articles to be dyed in the solution and allowing it to stand for such length of time and at such temperature as will get the best results, the suggestion being made that with most colors the best length of time is about 30 minutes, and the best temperature is 170 degrees to 230 degrees F.

The claims specifically relied upon are 1, 3, 4, 5, 7, and 8. Of these the first four are process claims, and the last two are product claims.

It is convenient to consider first the two product claims. They are as follows: "7. A bone material or product completely penetrated to a substantial depth with coloring material." "8. A bone material or product completely penetrated throughout with coloring material."

The defendant admits infringement of these claims, if valid, but contends that, if they are construed as extending to anything beyond a product resulting from the specific process of the patent, they are invalid, first because of inherent defects, and second by reason of anticipation.

The recent decision of the Supreme Court in Holland Furniture Co. v. Perkins Glue Co., 277 U. S. 245, 48 S. Ct. 474, 72 L. Ed. 868, fully sustains the defendant's position upon the first point. That case decided:

First. That a product claim, to be valid, must contain a description of the ingredients entering into the composition, sufficient to define the invention and carry it beyond the previous development of the art.

Second. That the description of the ingredients must be in terms of their physical characteristics or chemical properties, and that a description in terms of the use or function either of the ingredients or of the product itself is not sufficient.

Third. If the claim indicates a characteristic ingredient without sufficient particular-

ity to carry it beyond the previous development of the art, the claim will be read in connection with the specification and limited thereby.

The typical product claims in that case as read by the court were for a starch glue which, combined with about three parts or less by weight of water, will have substantially the same properties as animal glue. 277 U. S. page 251, 48 S. Ct. 474, 72 L. Ed. 868. The court held that the part of the claim which prescribed that the product would have the properties of animal glue was merely a description of the starch ingredient in terms of its function, and that the same principle which forbids claiming a patent on the result or function of a machine extends to an attempt to broaden product claims by describing the product exclusively in terms of its use or function. 277 U. S. page 255, 257, 48 S. Ct. 474, 72 L. Ed. 868. Reading the specifications with the claim, the court found that the essential ingredient constituting the invention was a kind of starch which had a certain definite degree of water absorptivity, and that, when so read, the patent could be sustained as a new composition of matter and as an advance beyond the prior art, but that, when the invention was so described and limited, the defendant did not infringe. 277 U. S. page 255, 48 S. Ct. 474, 72 L. Ed. 868.

 Now turning to the Bertolet patent in suit and accepting claims 7 and 8 at their face value as true claims for compositions of matter, we find that the ingredients are described simply as bone and coloring material. I suppose there are literally hundreds of thousands of substances which may properly be described as coloring material. There is no further identification of this ingredient by physical characteristics or chemical properties. The added descriptive term is that the coloring material has penetrated the bone. Looking through the form and at the substance, it is evident that what (if anything) Bertolet really has invented is a kind of dyestuff or dye bath which, when applied to bone, will carry the coloring material into the article and penetrate it throughout. That characteristic or property of the dye bath is properly a function. Being such, it cannot be claimed under the guise of a description of the product in a product claim. In the Perkins Glue Case the claim was for a starch glue as good as animal glue. In this case the claim in substance is for a dye bath which will carry coloring matter into the interior of bone articles. Both are in reality claims

for functions, and neither are valid, unless limited by the process disclosed. I therefore conclude that the element in these claims describing penetration of the bone will not sustain the validity of the claims.

Still following the rule of the Holland Furniture Co. v. Perkins Glue Co., supra, if the claims are to be sustained at all as product claims, it can be only by reference to the specification. Eliminate the part of the claim which calls for a function, and what is left (a combination of bone and coloring material generally) not only fails to carry claims beyond the conceded accomplishments of the prior art but is entirely too vague to stand by itself. The bone ingredient of the combination of course needs no further description. If the coloring ingredient be read in connection with the specification, it appears that it consists of a combination of certain dyes together with other elements among which are mentioned fat or fatty acids, petroleum oil distillates, and coal tar distillates. If so construed it might be sustained as a valid patent for a product or composition of matter, but it is really unnecessary to decide this question, since, in view of the findings which will appear hereafter, the defendant does not infringe the process.

I have not overlooked the point foreshadowed by the plaintiff's testimony and argument that the coloring material referred to in claims 7 and 8 might mean the dye only, and that the other ingredients of the dye bath are merely vehicles by which the dye is carried into the bone. The trouble with this argument, however, is that, if the coloring material is to be limited to the dye only, then the claim does not describe the invention; because, if the plaintiff's theory of the way it works is correct, the porous structure of the bone is penetrated, not only by dye, but by fat and oil distillates, or whatever else is used. Some parts of this may disappear by evaporation, but there is no evidence satisfactory to me that the fat at least does not remain in the bone along with the dyestuff in the completed product. Probably other elements do so also. The result is that a claim for bone penetrated by dye only, is not a description of the product resulting from this invention, and the claim would fall.

Summing up the policy underlying its decision in Holland Furniture Co. v. Perkins Glue Co., supra, the court there said: "A claim so broad, if allowed, would operate to enable the inventor, who has discovered that a defined type of starch answers the required purpose, to exclude others from all other

types of starch, and so foreclose efforts to discover other and better types. The patent monopoly would thus be extended beyond the discovery, and would discourage rather than promote invention."

The case of American Fruit Growers v. Brogdex Co. (C. C. A.) 35 F.(2d) 106, 107, is not in conflict with the principles of the Perkins Glue Company decision. In the American Fruit Growers Case the two elements of the product were as fully described as it was possible to do. They were fresh citrus fruit and borax. Borax is a perfectly well-defined substance, and the term admits of no variation. The claim for an amount of borax, "very small but sufficient to render the fruit resistant to blue mold decay," while it may have referred incidentally to a function, did not improperly broaden the product claim or allow a wide range of choice of ingredients or extend the patent monopoly beyond the discovery. Thus the fundamental fault condemned in the Perkins Glue Company Case was avoided, and the claims properly could be sustained.

In addition to what has been said, these claims unless limited to a product produced by the patented process, would be anticipated, and for that reason invalid. There is abundant evidence on this point which it would serve no good purpose to review at length. Briefly, however, the disclosure of the Smith Gardner United States patent No. 99,306 is a complete anticipation of these product claims. The George Hand Smith British patent is for a method of treating bone, vegetable ivory, and other porous substances. The method, of course, is not Bertolet's method, but it is clear from reading the specification that the product is an article penetrated to a substantial depth by the coloring material (page 4, lines 18–20). The Smith United States patent No. 292,220 states that the "object of my invention is to color * * * some distance into the substance or body of the materials treated * * * whether such substance be of animal, vegetable or mineral matter—such for instance as * * * bone. * * *" By his process he discloses that he can obtain a bone article penetrated by coloring material. To the same effect is Smith United States patent No. 292,222. There are other patents which clearly indicate that dyed bone articles can be obtained. A prior publication, Soxhlet, "The Art of Dyeing and Staining Marble, Artificial Stone, Bone, Horn, Ivory and Wood and of Imitating all Sorts of Wood," also completely anticipates the product claimed by the plaintiff.

Claims 3, 4, and 5 are process claims. They may be considered as a group by reason of the fact that they all include either fat or a fatty acid (stearic acid) as an element. The convincing weight of the evidence is to the effect that the defendant does not infringe, and has not infringed, these claims, and I so find. The defendant is dyeing bone buttons by a process that results in a thorough penetration of the article by the dye. Hafleigh, the defendant's secretary and treasurer, who has been actively connected with the business for over thirty years, and is thoroughly familiar with the process of dyeing, testified that the dye bath used in dyeing colored bone buttons consisted of spirit soluble dyes dissolved in alcohol, that in dyeing black buttons a mixture of hematine (pheno-black) dissolved in hot water was used, and that in dyeing yellow tiddledewinks (the only kind of tiddledewinks in which the dye penetrates the bone) a spirit and water soluble dye was used dissolved in cold water. The defendant's foreman in charge of mixing the dye bath since 1916 testified to the same effect; also the employee who had charge of the actual dyeing of the buttons in the bath. These three witnesses all swore positively that no fat or fatty acid was used at any stage of the process. To rebut that plaintiff's suggestion that certain dyes as purchased from the manufacturer might contain fat or fatty acid, the defendant called a salesman from the dye manufacturer from whom the defendant has purchased its dye exclusively since 1925, and the chemist employed by the dye manufacturing company which made the dye. Both of these witnesses testified positively that there is no fatty acid contained in any of the colors sold by them to the defendant. This evidence was not impeached by the plaintiff except by the witness's statement that certain of the dyes sold could be successfully compounded with stearic acid for dyeing purposes, plus the suggestion (not supported by testimony) that this might have been done at some time prior to the compounding of the dye bath.

The plaintiff also undertook to show by a chemical analysis that the buttons sold by the defendant contained fat. Certain of the defendant's buttons were in court as exhibits and these were the subject of various analyses. They consisted of (a) certain tan and blue buttons purchased in May, 1929 (Exhibit 2), (b) certain white and tan buttons purchased in January 1930 (Exhibit 3). This

bill in equity was filed in April 1928, and therefore all the bottons tested were purchased after the filing of the bill. It is not possible to say when they were manufactured, and the results of the analyses are not taken as conclusive upon the question of infringement. They have a bearing upon that question, however, and should be considered. Bertolet, the inventor, tested the colored buttons purchased in January 1930, and found a residue of fat in them which he estimated (without claiming to be accurate as to the amount) at .15 per cent. Harold, the plaintiff's expert, analyzed the defendant's colored buttons of May, 1929, and obtained for the tan buttons .219 per cent. of fat and for the blue buttons .148 per cent. From the white buttons purchased in January, 1930, he obtained .116 per cent., and concluded from the feel to the fingers that the fat from the colored buttons was of a different character from that obtained from the white buttons. Shreeve, the defendant's witness, testified that the white buttons of January, 1930, in which Harold had found .116 per cent. of fat, contained .148 per cent. of fat.

The analysis of the white buttons was made because it appeared that all bone buttons contain some fat. Before dyeing, they are de-greased, but even after that there will always be a small residue of fat remaining. It should be a pretty constant figure, because the fat is a salable product, and every effort is made to remove all fat from the bone. Of course, the amount of fat that goes in with the dye can be ascertained by analysis of the colored buttons only if the amount of fat already in the button before dyeing is known. Hence the analyses of the white button.

At the court's suggestion, and by stipulation, white and colored buttons from the purchase of 1930 were submitted to an independent chemist selected by the court. His analysis, made by what the court is satisfied was a more thorough process than was used by any of the other experts (except possibly Harold's process for the colored buttons of May 1929), showed an average of .15 per cent. of fat for the white buttons and an average of .069 per cent., plus, for the colored buttons. Thus there was less fat in the buttons after they were dyed than before. The conclusion would seem to follow, not only that no fat was used in dyeing the buttons, but that the alcohol in the dye bath actually extracted some of the fat already in them. The plaintiff's argument that, even if no fat is used in the original dye bath, this extraction of fat from the buttons produces a dye

bath which is an infringement of the bath of his processes, is obviously unsound. The claims under consideration are for a method of dyeing by the use of fat and other substances. The disclosure of the patent and of these claims imperatively calls for the use of fat in the dye bath. If the fat in the bone is sufficient to produce the result without including it in the dye bath, then the process used by the defendant is not the one patented, but something entirely different.

The evidence of the chemical analyses point strongly to the absence of fat from the defendant's dye bath, and, taken in connection with the testimony of the defendant's witnesses, has convinced me that the defendant does not infringe claims 3, 4, and 5.

The validity of these claims, in view of the prior art, was also contested, but it is unnecessary to decide that issue.

Claim 1 is a process claim, and is as follows: "The herein-described method of coloring bone material, which consists in subjecting it to a mixture of coloring matter crude petroleum oil distillate, and coal tar distillate."

It differs from the claims just considered, in that it does not include the use of fat or fatty acid as a necessary element in the process. The charge of infringement of this claim is based upon the fact that the alcohol admittedly used by the defendant in its dye bath is alcohol denatured under government formula No. 5. This formula is as follows: "100 parts by volume ethyl alcohol, not less than 160 proof; 4 parts by volume approved wood alcohol (denaturing grade); 0.75 part by volume of the compound or one similar thereto known as aldehol, grade A; or 0.25 part by volume of a part pyridine bases; 0.50 parts by volume approved benzine. (kerosene)."

Benzine is a crude petroleum distillate. It seems to have been assumed by witnesses on both sides that pyridine is a coal tar distillate. As a matter of fact, it may or may not be. The Encyclopedia Britannica says that pyridine is a "liquid organic base formed during the destructive distillation of a great variety of nitrogenous organic substances such as bone, coal, shale, and lignite. It has been detected in crude petroleum and fusil oil, and is also a characteristic decomposition product of various alkaloids." Its chief commercial sources are bone oil and coal tar. There is no evidence whatever that the pyridine contained in the denatured alcohol used by the defendant came from coal tar. The

burden of proof is upon the plaintiff to show that the defendant has infringed by using coloring matter, crude petroleum distillate, and coal tar distillate. He does not show it by evidence that the defendant uses coloring matter, crude petroleum distillate, and a substance which may or may not be coal tar distillate. There is, therefore, no evidence of infringement of this claim.

Though not necessary to the decision, it is also quite clear to me that the claim is invalid because not supported by the disclosure of the specification. The only suggestion contained in the specification of a process upon which this claim could be based is the sentence: "Some shades of blue, however, can be obtained with little or no fat by using a mixture of kerosene and cresol." There must be hundreds of shades of blue, possibly thousands, and there is no indication of what shades require this combination of ingredients. Further, there is nothing to indicate the proportions to be used. The most extensive experimentation would be necessary before it could be determined what blue dyestuffs in what proportions would produce a commercial result. The law is clear that such a disclosure will not support a valid claim.

A decree may be submitted adjudging claim 1 not infringed and also invalid; claims 3, 4, and 5 not infringed; claims 7 and 8 invalid as covering any product produced otherwise than by the process disclosed in the patent, and, when so limited, not infringed.

J. Preston Swecker and Vernon E. Hodges, both of Washington, D. C., and Albert W. Sanson, of Philadelphia, Pa., for appellant.

Chas. H. Howson and Dexter N. Shaw, both of Philadelphia, Pa. (Bryan A. Hermes, of Philadelphia, Pa., of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

PER CURIAM.

The opinion of the trial judge so fully and satisfactorily discusses and properly disposes of every question involved in this case that a further opinion by this court would be but an effort to clothe in different language what has been already said. After careful individual study and joint conference by the members of this court, they all agree in affirming the decree below on that court's opinion.